OPINION
BOLGER, Justice.
L. INTRODUCTION
The State's local school funding formula requires a local government to make a contribution to fund its local school district,. The superior court held that this required local contribution is an unconstitutional dedication of a "state tax or license." But the minutes of the constitutional convention and the historical context of those proceedings suggest that the delegates intended that local communities and the State would share responsibility for their local schools. And those proceedings also indicate that the delegates did not intend for state-local cooperative programs like the school funding formula to be included in the term "state tax or license." These factors distinguish this case from previous cases where we- found that state funding mechanisms violated the dedicated funds clause. We therefore hold that the existing funding formula does not violate the constitution, and we reverse the superior court's grant of summary judgment.
II. FACTS AND PROCEEDINGS
A. Schobl Funding Formula
Article VII, section 1 of the Alaska Constitution requires: the state legislature to "establish and maintain a system of public schools" open to all children in the state.[1] *88 'To fulfill this constitutional mandate, the legislature has defined three types of school districts according to where the district is located: city school districts, borough sehool districts, and regional education attendance areas.[2] "[Ejach organized borough is a borough school district"; [3] a borough must "establish{ ], maintain[ 1, and operate[ ] a system of public schools on an areawide basis.[4] ' Local school boards manage and control these school districts under authority delegated by AS 14.12.020. This statute requires local borough and city governments to raise money "from local sources to maintain and operate" their local schools.[5]
The local school funding formula begins with the concept of "basic need." This concept is intended to equalize districts by providing them with needed resources, taking into account differences among districts.[6] A statutory formula determines a district's basic need based on two variables: the dis-triet's adjusted average daily membership and the statewide base student allocation.[7] The district's adjusted average daily membership accounts for several metrics such as enrollment, school size, relative costs in the district, the number of students with special needs, and the number of correspondence students.[8] The base student allocation is a per-student allowance set by a statute that the legislature periodically revisits.[9]
To fulfill this basic need, districts receive "state aid, a required local contribution, and eligible federal impact aid."[10] State aid comes from the "public education fund," to which the legislature allocates funds annually.[11] The amount of state aid that a district receives is based on three variables: the district's "basic need," the district's required local contribution (if any), and the district's federal impact aid.[12] If state appropriations fall short of the amount of state aid calculated under AS 14.17.410, then the State must reduce each district's basic need on a pro rata basis.[13]
'The requu'ed local contribution offsets the amount of state aid provided to satisfy a district's basic need.[14] Satisfying the local contribution requires a local community to contribute an amount that falls within a statutory range that reflects the value of taxable real and personal property located within the district.[15] At minimum the contribution *89 must. equal the "equivalent of a 2.65 mill tax levy on the full and true value of the taxable real and personal property in the district as of January 1 of the second preceding fiscal year." [16] The State, however, cannot require an organized borough or city to contribute more than "45 percent of a district's basic need for the preceding fiscal year." [17] A city or borough sehool district also may make a voluntary contribution, but a statutory cap prevents a local community from contributing more than the greater of the "equivalent of a two mill tax levy on the full and true value of the taxable real and personal property in the district" or "28 percent, of the total of the district's basic need for the fiscal year."[18] Thus, under the current, framework, organized boroughs and cities work together with the State to support public schools.
B. Prior Procéedings -
Ketchikan Gateway Borough is an organized borough that must annually contribute to fund its schools under AS 14.12.020.[19] The required payment, set. by the school funding formula,[20] supports the Ketchikan Gateway Borough School District. In 2018, the district's "basic need" for the upcoming 2014 fiscal year was almost $26 million; the required local contribution was about $4.2 million, Though the Borough contributed this amount "under protest," it voluntarily contributed an additional $8.8 million. After contributing the funds, the Borough brought suit against the State, asking the superior court, first, to declare the required local contribution unconstitutional; second, to enjoin the State from requiring the Borough to comply with the statute; and, third, to direct the State to refund its protested $4.2 million payment. Both partles moved for summary Judgment.
"The superior court partially granted the Borough's motion. It agreed with the Borough that the required local contribution violated the dedicated funds clause under article IX, section 7 of the state constitution. The dedicated funds clause provides:
The proceeds of any state tax 'or license shall not be dedicated to any special purpose, except as provided in section 15 of this article or when required by the federal government for state participation in federal programs. This provision shall not prohibit the continuance of any dedication for special purp'éses existing upon the date of ratification of this section by the people of Alaskan.[21]
The supenor court. concluded that the required local contribution constituted the proceeds of a state tax or license; that the local contribution statute earmarked those funds for a specific purpose and prevented the legislature from using the funds in any other manner; and that the required local contribution was not exempt from the constitutional prohibition against dedicated funds.
The superior court denied summary judgment on the Borough's other claims. It con-eluded that the local contribution did not violate the appropriations or governor's veto clauses and that equity did not require the State to refund the local contribution to the Borough for the 2014 fiscal year.
The appropriations clause under article IX, section 18 provides "No money shall be withdrawn from the treasury except in accordance with appropriations made, by law. No obligation for the payment of money shall be incurred: except as authonzed by law Uno- *90 bligated appropriations outstanding at the end of the period of time specified by law shall be void."[22] And the governor's veto clause under article II, section 15 provides: "The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills, He shall return any vetoed bill, with a statement of his objections, to the house of origin." [23] The court concluded that neither clause was violated because the required local contribution "does not enter the state treasury" and because the required local contribution is not an appropriation. The court further concluded that it was unproblematie that the required local contribution never entered the state treasury. In denying the Borough's request for a refund, the court explained that the State was not unjustly enriched because the required local contribution did not benefit the State. woe
The State appealed and the Borough cross-appealed, together asking us to consider all four prongs of the superior court's decision: whether the required local contribution is unconstitutional under the dedicated funds, appropriations, or governor's veto clauses and, if so, whether equity requires refunding the Borough's protested payment.[24]
III, STANDARD OF REVIEW
"We review a grant or denial of summary judgment de novo."[25] Questions of constitutional and statutory interpretation, including the constitutionality of a statute, are questions of law to which we apply our independent judgment.[26] We adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[27] Legislative history and the historical context, including events preceding ratification, help define the constitution.[28] Statutes passed immediately after statehood give insight into what the founders intended.[29] 'We presume statutes to be constitutional; the party challenging *91 the statute bears the burden of showing otherwise.[30]
IV. DISCUSSION
A. The School Funding Formula Does Not Violate The Dedlcated Funds Clause. |
Before Alaska became a state in 1959, the Territory and local areas shared responsibility for funding public education.[31] The legislature derived the current school funding formula from this pre-statehood program, the framework of which has remained largely unchanged.[32]
The Borough contends that the school funding program is a "state tax or license" that is subject to the dedicated funds clause because it is not a "dedication ... existing upon the date of ratification of [the Alaska Constitution]" [33] and because no other exemption from the dedicated funds clause applies, Accordingly it concludes that the required local contribution violates the dedicated funds clause. First the Borough claims that before statehood, "municipalities exercised independent judgment and discretion as to what they could afford to pay for schools" and notes that "cities were not required to provide any particular amount to the school districts." Second the Borough argues that the refund amount that cities received from the Territory "depended on how much was appropriated by the Legislature for such purpose."
However, as we explain below, the required local contribution is the most recent iteration of a longstanding state-local cooperative program in which local. communities and the State share responsibility for funding Alaska's public schools. Accordingly, whether or not it is a dedication that predated statehood, the required local contribution is not a "state tax or license" within the meaning of the dedicated funds clause.
1. Under the Alaska Compiled Laws of 1949,. the Territory and local communities shared responsibility for fund- . ing local schools.
Boroughs did not exist before Alaska became a state. . Under the Alaska Compiled Laws of 1949, each city constituted a single school district and each had an obligation to provide public school services.[34] An incorporated city also could join with adjacent areas to form an independent school district.[35] Local school boards, which oversaw local school activities, had the power to assess, levy, and collect taxes to assist with this obligation to support their schools.[36] Though territorial law did not dictate an exact funding amount, it required cities to provide "suitable school houses ... and ... the necessary funds to maintain [local] public schools" [37] or, if part of an independent school district, to set aside funding for their share of local school costs.[38] Like today, local communities enjoyed discretion in determining how to satisfy their funding obligation. They could dedicate a special school tax to the purpose, or they could dedicate a portion of the general municipal tax to the purpose.[39] Territorial law . also required school boards to annually submit to *92 the Territory a budget of anticipated expenses, a record 'of all funds collected, and receipts for their expenses.[40]
Local communities also received support for local schools from the Territory. Territorial law provided for the legislature to refund a portion of local school expenses from time to time.[41] The amount local communities received reflected a statutory formula that considered factors like the number of students in the district, the total amount the district spent to maintain its school system, and the expenses the Territory had-approved in the district's budget.[42] Thus before Alaska became a state, local communities and the Territory together supported local schools, much like today.
2. The lframe‘i's drafted the constitution to allow such state-local cooperative programs to continue after statehood,
The delegates atﬂie constitutional convention recognized the benefits of such, state-local cooperative programs.[43] But they also recognized the importance of preserving state control over state revenue.[44] Through the dedicated funds clause of article IX, seetion 7, the delegates sought to balance such concerns.[45] Early drafts of the clause generally prohibited the dedication of state revenue while allowing for certain exceptions. The delegates recognized, for example, that dedications should be allowed when required to participate in federal programy -and when such dedications preemsted statehood. One such draft provided: _
All. tax revenues shall be deposited in a general fund to be established and maintained by the state. This provision shall not prohibit the continuance of any special fund for special purposes existing at the effective date of the constitution.[46]
A subsequent draft modified the first sentence: "All revenues shall be deposited in the State treasury without allocation for special purposes, except where state participation in Federal programs will thereby be denied,"[47] *93 and preserved the exemption for allocations in existence at the time 'of statehood.[48]
'But the delegates feared that this draft language might prohibit too much.[49] Accordingly they modified the clause in two key respects. First, they reworded the clause by replacing "[alll revenues" with "proceeds of any state tax or license:" Second, they revised the last sentence by replacing “any special fund" with "any dedlcahon’"
The proceeds of any state ta or shall not be dedicated to any special purpose, except as provided in section 15 of this article or when required byfthe federal government for state participation in federal programs. This provision shall not prohibit the continuance of any dedication for special purposes existing upon the date of ratification of this section by the people of Alaska,[50]
Through such revisions, the delegates recognized that any prohibition on dedicated funds required reasonable limits, A flat prohibition was neither feasible nor desirable.[51] The dedicated funds clause could not be "strictly] interpret[ed]" because both legal and contractual obligations would "require a segregation of certain money's," including:
pension contributions, proceeds from bond issues, sinking fund receipts, revolving fund receipts, contributions from local government units for state-local cooperative programs, and tax receipts which the state might collect on behalf of local government units,[52]
Delegate White explained that the amended language allowed these exceptlons to continue: "By going to the tax itself and saying that the tax shall not be 'earmarked, we eliminated [the need to make exphmt] all seven of those exceptmns » [53]
The colloquy among the delegates reflects this deliberate compromise embodied by :the clause, Just as the delegates voiced the need for Staté control over state revenue, the delegates lauded the clause for preserving certain programs, including those for "highways, airports, and schools." [54] Through this compromise, the delegates allowed dedications "now on the.statute books [to] be left in effect as long as the legislature saw fit to leave them there," [55] and, as Delegate White noted, the delegates allowed setting aside certain monies pursuant to statute, including those for state-local cooperative programs.[56]
The delegates recognized that an arrangement of shared responsibility between the State and local communities offered substantial benefits, particularly in the transition to the borough system of local governance. Active participation in local governance promised to save the State "hundreds of thousands of dollars of the taxpayers' money." [57] Cooperative programs, like those in which *94 the State and local communities shared the cost of providing local public services, encouraged unincorporated areas to incorporate by reassuring them that they would "definitely benefit by organizing [to] get[ ] into the picture of local government.[58] Existing cost-sharing programs between the Territory and local communities, like that in education, combined with increased local control over education and other services offered such incentives.[59]
Before statehood, responsibility for local governance largely fell to cities, The state constitution revised this system by creating boroughs with the potential to hold more power and more responsibility:
The entire State shall be divided into boroughs, organized or unorganized. They shall be established in a manner and ac cording to standards provided by law.... ~The legislature shall classify boroughs and prescribe their powers and functions.[60]
Through the borough system, the delegates sought to avoid the redundancy, confusion, and unnecessary costs of overlapping county-city systems elsewhere in the nation.[61], CGiven such concerns they decided not to grant school districts taxing power.[62] Instead the delegates made local schools dependent on boroughs for money.[63] While the delegates entrusted the State with "establish[ing] and maintain{[ing] a system of public schools open to all children of the State,[64] " they anticipated that boroughs likely would have to levy a tax to provide for schools.[65]
. The delegates recognized that the transition to the borough system would take time.[66] In allocating power and responsibility under the Alaska Constitution, the delegates sought to provide the State with room to grow and to adapt,. They designed the constitution to be flexible so that the legislature could fill in *95 the "exact details [later]."[67] Though the delegates sought to limit certain powers and to avoid certain pitfalls, they did not intend to compel the State to unravel existing programs nor did they intend to prevent the State from experimenting and adapting to changing cireumstances.
8. Early legislation built upon the pre-statehood laws that required the Territory and local communities to share responsibility for local schools.
Early post-statehood legislation filled in the gaps of the constitutional framework. In 1961 the legislature enacted incorporation standards for boroughs, as required under article X, section 8 of the Alaska Constitution, and delegated significant responsibility to them.[68] As the delegates envisioned,[69] those responsibilities included the State's constitutional obhgatlon to ' provide public schools.[70]
The 1961 act charged boroughs with "establish[ing], maintain[ing], and operatiing] a system of public schools on an areawide basis." "[71] To fulfill this mandate, boroughs were given responsibilities like those of cities. State laws that governed city school districts now also governed borough school districts, including those related to "financial support ... and other general laws relating to schools."[72] These financial support laws and other general school laws were dargely the same as those in place pre-statehood.[73] As in the Territory, local communities, including boroughs, were requlred to support local schools.[74]
In a 1962 act, the legislature began to adapt the pre-statehood cooperative program for providing school services to the borough system of governance. The legislature clarified that "Ielach organized borough constitutes a borough school district." [75] Like the Territory, the State continued to oversee local school operations, budgeting, and spending,"[76] and it shared responsibility for administering and supervising the system of public schools with local school boards.[77] And the 1962 act began to refine the system, developing the public school foundation account to provide state funding for public schools on an annual basis and fine-tuning the method for calculating the amount of state aid and the required local contribution.[78] The State and local communities continued to support schools together.
*96 Statutes enacted soon after statehood generally reflect the framers' intent.[79] Post-statehood, as the delegates envisioned, the legislature continued to hold local communities responsible for supporting schools under the borough system of local governance. While the State "of necessity provide[d] certain basic functions,[80] it also, as the delegates anticipated, delegated -some -of its duties to boroughs with the understanding that boroughs, "would probably have a, certain basic tax to provide schools" to borough residents.[81]
4, Subsequent legislation did not alter the basic framework of state-local cooperation in providing local public schools.
In 1966, as the borough system began to gain traction, the legislature divided school districts into three categories. Organized cities located. outside an organized borough were responsible for managing and controlling a city school district, organized boroughs were responsible for the district within their boundaries; and districts outside organized boroughs and cities were operated (and fully funded) by the State.[82] Ag before the State required city and borough districts to help maintain and operate local schools with money "raised from local sources," and the State agreed to contribute an amount defined by a statutory formula [83]
From 1969 to 1970, as the Borough notes, the legislature redefined state aid under Chapter 17 of the statute to equal each dis-triect's basic need.[84] And it repealed provisions mandating that local communities contribute to local school funding, including AS 1417.080 (required local effort) and AS 14.17,180 (computation of required local effort)[85] But the legislature left the state-local cooperation foundation untouched. As was true in 1961, "[elach organized borough constitute[d] a borough school district" and each organized borough was required to "establish, maintain, and operate a system of public schools on an areawide basis." [86]
The next year, in 1970, legislators again explicitly mandated that local communities and the State work together to fund local schools. The revised formula for allocating responsibility between the State and local communities experimented with new variables.[87] For example, it determined state aid based on taxable property values within the district in light of the number of students a district served.[88] Previously, the required local effort considered only the taxable property within the district; it did not standard *97 ize that value.[89]
In 1980, as the Borough points out, the legislature again tweaked the school funding system,. Rather than separately calculate a district's "state aid" and a district's "basic need," the statute calculated only a district's "basic state aid." [90] Through this shift in focus, the statute no longer set out to estimate a district's basic need or a district's total budget. Unlike before, the statute did not consider local contributions.[91] But it also did not rule them out.[92] After all, as before, the State continued to hold boroughs responsible for "establish[ingl, maintain{ingl, and operat[ing] a system of public schools on an areawide basis." [93]
Subsequently in 1986 the legislature again reformulated the state aid calculation. It reinstated the requirement that local communities contribute to local school funding.[94] And the amount of state aid continued to reflect factors like the number of schools in the district, the district's need for special education services, and a district's specific characteristics.[95]
The legislature has continued to refine this program, as the delegates envisioned it would, but the program's pre-statehood core has remained intact. Just as the Compiled Laws of Alaska charged local communities with "provid[ing] the necessary funds to maintain [local] public schools,"[96] title 14, chapter 17 requires boroughs and cities to fund schools with money raised from local sources."[97] While the details of this state-local cooperative program have changed, the legislature has never relieved local communities of their longstanding obligation to support local public schools. Rather as one delegate stated when explaining the rationale for shifting the onus of education from cities to boroughs: "When you come to the bor *98 ough though, the borough is interested in education. It will be one of the basic functions which it will be responsible for.[98]
5. We have yet to consider the dedicated funds clause in light of state-local cooperative programs.
The Borough argues that State v. Alex and its progeny dictate that the local funding formula of AS 14.12.020(c) and 14.17410(b) violates the dedicated funds clause. But Alex and its progeny do not dictate the result here. Never before have we considered this type of longstanding state-local cooperative program.
a. State v. Alex
We first considered the seope of the dedicated funds clause in State v. Alex.[99] There, a group of commercial fishers alleged that a statute authorizing mandatory assessments on their salmon sales "for the purpose of providing revenue for ... qualified regional [aquaculture] association[s]" violated the dedicated funds clause.[100] 'We agreed with the fishers and accordingly rejected the State's argument, which attempted to distinguish between "general revenue taxes" (subject to the dedicated funds clause) and "special assessments" for services (allegedly not subject to the clause).[101] In doing so, we adopted a broad meaning of "tax" in light of the origin of the clause's prohibition. We considered the debates at the Convention; the studies the delegates relied on when drafting the section, including those that emphasized importance of protecting State control over state revenue; and how the delegates revised the clause, including the change from "all revenues" to the "proceeds of any state tax or license." [102] In light of this context, we held that the clause prohibited dedicating not only taxes but also special assessments like the one at issue in Alex,[103]
But unlike this case, Alex did not ask us to consider a longstanding state-local cooperative program. In Alex, the program at issue was first enacted in 1976, nearly 20 years after Alaska became a state, and there was no evidence suggesting that the program was one the delegates intended would fall outside the clause.[104] The regional aquaculture asso-clations, who would benefit from the assessment, were also established in 1976, long after Alaska became a state.[105] Accordingly in Alex we did not consider whether a longstanding state-local cooperative program was a "state tax or license" within the meaning of the dedicated funds clause.
b. City of Fairbanks v. Fairbanks Convention & Visitors Bureau
In City of Fairbanks, we evaluated the constitutionality of a voter initiative that restructured how the city allocated bed tax revenues.[106] Article XI, section 7 of the Alaska Constitution prohibits any initiative that dedicates or appropriates funds,[107] and the initiative's opponents argued that it did both.[108] We held that the initiative did not dedicate funds because it actually increased the council's flexibility to make spending decisions.[109] 'We relied on Alex to determine whether the initiative dedicated funds because it was the only other time we had *99 considered the meaning of dedicated revenues.[110]
But we did not interpret the dedicated funds clause of article IX, section 7 in City of Fairbanks. Article XI (at issue in City of Fairbanks), unlike article IX (at issue here and in Alex), defines the scope of the initiative, referendum, and recall process.[111] By-contrast article IX defines the scope of a different set of powers, those related to state finance and taxation.[112] Because City of Fairbanks considered an entirely different set of powers, that decision has no bearing here.
c. Sonneman v. Hickel .
Ten years after Alex, we considered the dedicated funds clause for the second timé in Sonneman v. Hickel, where we held unconstitutional in part the act that created the Alaska Marine Highway System Fund.[113] The legislature established the Alaska lila-riñe Highway System Fund as a special account in the general fund and required the Alaska Marine Highway System, which operates the Alaska ferries, to deposit its gross revenue into that account.[114] Through the act, the legislature sought to create incentives for the Marine Highway System by setting aside some of its revenue for its own use.[115] Among other provisions, the act outlined how the legislature and the Department of Transportation and Public Facilities, which houses the Marine Highway System, could appropriate and could request money from the fund, and it dictated how the legislature could spend the money therein.[116]
We found that such provisions restricted executive' authority to request appropriations.[117] Accordingly we held that the statute violated the dedicated funds clause of article IX, section 7.[118] In doing so, we recognized that a statute can impermissibly dedicate funds in various ways: A statute could require the legislature to use funds only for 'a specified purpose or,' as in Sonneman, the statute could preclude agencies from requesting an appropriation for a given purpose.[119]
But Sonneman does not control our decision here either. Nothing in Sonneman suggests that the restriction on executive authority over marine highway revenue existed before statehood. And, unlike the school funding formula at issue'here, in Sonneman we did not consider á state-local cooperative program in which local communities and the State share responsibility for providing a local public service.
d. Myers v. Alaska Housing Finance Corp.
Another ten years passed before we again considered the dedicated funds clause. In Myers v. Alaska Housing Finance Corp., we upheld a legislative scheme for selling anticipated fútóre state revenue from a settlement against tobacco companies so that it could fund rural school improvements.[120] The legislature ' accomplished the scheme in three steps: First, the legislature deemed' the State’s right to future séttlement payments to be an asset.[121] As with other assets, the State could sell the' future settlement pay-ménts’for a ltottp sum amount that reflected the present value of the anticipated revenue stream.[122] Second, the legislature issued *100 revenue bonds secured by the estimated present value of the settlement.[123] Finally, the legislature then appropriated a portion of the bond proceeds to fund the necessary school improvements.[124]
Though the tobacco settlement fell within the scope of the dedicated funds clause and though the scheme dedicated future state revenue, we concluded that the scheme was constitutional,[125] We explained that unlike Alex and Sqnnemom, which clearly dealt with the allocation of future revenues, the revenue allocation scheme in Myers was different.[126] The scheme in Myers reduced future revenue to present value and used that value to secure bonds, the proceeds of which would be dedicated to fund school improvements that year.[127]
e. Southeast Alaska Conservation Council v. State
Most recently, in Southeast Alaska Conservation Council, we returned to the dedicated funds clause when we sﬁruck down an act that transferred state land to the University of Alaska and then dwected that thcome derived from that land be held in trust for the University.[128] . Before concludmg that the act was unconstitutional, we engaged 1n a two—part inquiry, First, we concluded that proceeds from the land were within the scope of the clause's reference to "proceeds of any state tax or license.[129] In doing so, we reiterated our warning in Alex that the "constitution prohibits the dedication of any source of revemue.[130] And we explained that, unlike Myers, the act did not contemplate a non-recurring appropriation, which as in Myers would have been permissible under the clause [131]
Second, we considered whether the University was exempt from the dedicated funds prohibition by virtue of an implied exception under article VII, section 2 of the Alaska Constitution, which authorized the University to hold title to real property.[132] In rejecting this argument, we explained that our case law establishes that University lands are state lands over which the State retains authority regardless of whether the University holds title.[133] As a result, all revenue from University land is state revenue subject to the clause[134]
Southeast Alaska Conservation Council did not rule out the possibility that we might find other statutes exempt from the dedicated funds clause. Like the other cases in this line, it did not address a longstanding cooperative program, like the school funding program, in which local governments and the State share responsibility for providing a local public service, Such programs do not violate the dedicated funds clause.
Here. we are asked for the first time whether local contributions to longstanding cooperative programs in which the State and local governments share funding responsibility run afoul of the dedicated funds clause. The minutes of the constitutional convention and the historical context of those proceedings reveal that the delegates did not intend for required local contributions to such programs to be included in the term "state tax or license." Today's statutory program for funding local public schools falls squarely within the type of state-local cooperative programs the delegates sought to exempt from *101 the constitutional prohibition on dedicated funds. We therefore conclude that the existing school funding formula does not violate the dedicated funds clause.
B. The School Funding Formula Does Not Violate The Appropriations Or Governor's Veto Clauses.
We agree with the superior court that the required local contribution does not violate the appropriations clause or the governor's veto clause of the Alaska Constitution.
Article IX, section 18, the appropriations clause, provides: "No money shall be withdrawn from the treasury except in accordance with appropriations made by law. No obligation for the payment of money shall be incurred except as authorized by law. Uno-bligated appropriations at the end of the period of time specified by law shall be void." [135] Article II, section 15, the governor's veto clause, provides: "The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills. He shall return any vetoed bill, with a statement of his objections, to the house of origin," [136]
Like the dedicated funds clause, the appropriations clause and the governor's veto clause both address, how the State spends state revenue. Together the clauses govern the legislature's and the governor's "joint responsibility ... to determine the State's spending priorities on an annual basis." [137] As with our preceding analysis, we must interpret these constitutional clauses "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters." [138]
The Borough argues that the required local contribution is an appropriation that bypasses the constitutionally mandated appropriations process and that the governor's veto clause requires that the governor be given the opportunity to veto this appropriation. If we assume the required local contribution is local money as the State contends, the required local contribution would not violate either the appropriations clause or the governor's veto clause because these clauses address state money, not local money, On the other hand, even if we assume that the local contribution is state money as the Borough contends, the required local contribution still would not violate either clause. The local contribution never enters the state treasury, and it is never subject to appropriations bills. The appropriations clause, per its plain language, applies to withdrawals from the state treasury, and the governor's veto applies to appropriation bills.[139] The required local contribution does not withdraw from the . state treasury; and it is not an appropriation bill. To C
The Borough correctly points out that the constitutional delegates intentionally established 3 system in which both the legislature and the governor would consider how to spend state money each year. But while all three clauses-the dedicated funds clause, appropriations clause, and governor's veto clause-address power over the state budget, the plain meaning of each clause reveals three distinct purposes. Through the dedicated funds clause, the delegates sought to avoid the evils 'of earmarking, which the delegates féared would "curtaill ] the exercise of budgetary controls and simply [would] amount[ ] to an abdication of legislative responsibility.[140] 'The delegates sought to protect State control over state revenue and to ensure legislative flexibility.[141] By contrast, the appropriations clause defines how the legislature may "spend state money after it has entered state coffers, and the gover *102 nor's veto clause provides an executive check on the legislature's spending plan'[142] Because the plain language of both the appropriations and governor's veto clauses indicates that these clauses restrict the State's power after money enters the state treasury,. not before, the required local contribution does not violate either clause.
C. The Borough Is Not Entitled To A Refund Of Its Protested Payment.
Because we find the required local contribution constitutional, we need not consider the Borough's request for a refund of its protested payment. Accordingly, we uphold the superior court's denial of the Borough’ request.
v. CONCLUSION
We REVERSE the superior court's decision granting summary judgment in favor of the Borough and REMAND to allow the court to enter judgment in favor of the State.
FABE, Justice, not participating.
STOWERS, Chief Justice, and WINFREE, Justice, concurring.

. Alaska Const. art. VII, § 1 ('The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions.").

. AS 14.12.010. City school districts are those located within a home-rule area or city bit outside an organized borough. Id. Borough school districts are those located in organized boroughs. Id. Regional education attendance areas are those located outside organized city, home-rule, or borough boundaries, Id. .

. AS 14.12. 010(2)

. AS 29,35. 160(a)

, AS 1412.020(c) ("The borough assembly for a . borough school district, and the city council for a city school district, shall provide the money that must be raised from local sources to maintain and operate the district."). By contrast, the legislature funds districts located in the regional educational attendance areas, which lack taxing authority, - Id. ('The legislature shall providé the state money necessary to maintain and operate the regional educational attendance areas."); see Alaska Const. art, X, § 2 ('The State may delegate taxing powers to organized boroughs and cities only."); Matanuska-Susitna Borough Sch. Dist. v. State, 931 P.2d 391, 399-400 (Alaska 1997) (stating that taxing power explains, in part, 'why the legislature treats districts differently).

. - Auaska Dage't or Epvc. & Earcy Dev,, Auaska's Pusuic ScHoor. Funpmg Formura: A REPORT TO THE ALASKA State Lfcistature 8 (2001).

. AS 14.17.410(6)(1),

. AS 14,17.410(b)(1)(A)-(D); AS 14.17.420(a).

. AS 14.17.470; see eg., ch. 9, §§ 8-10, SLA 2008 (setting the amount at $5,480 for 2008, $5,580 for 2009, and $5,680 for 2010); ch. 41, § 7, SLA 2006 (setting the amount at $5,380 for 2006). As of November 2015, the per-student allowarice is $5,830, AS 14,17.470.

. AS 141.17.410(b).

. See AS 14.17.300,

. AS 14..17.410(b)(1).

. AS 14.17.400(b).

. See AS 14.17.410(b)(1) (”[SJtate aid equals basic need minus a-required local contribution and 90 percent of eligible federal impact aid for that fiscal year."),

. AS 14.17.410(b)(2). The local contribution includes "appropriations and the value of in-kind services made by a district." AS 14.17.990(6).

, AS 14.17.410(b)(2). A mill rate is "a tax applied to real property whereby each mill represents $1 of tax assessment per $1,000 of the property's assessed value." Bmacx's Law Dictic. nary 1084 (10th ed.2014), °

. AS

, AS 14.17.410(c)(1)-(@2),

, AS 14.12.020(c) ("The borough asgemblyfor a borough school district ... shall provide the money that must be raised from local sources to maintain and operate the district. ") Ketchikan : Gateway Borough incorporated as a second-class borough on September 13, 1963. Ketchikan Gateway Borough, Alaska, Code 01.05.040 (2015). -

. See AS 14.17.410(b)(2) ("[The required local contribution of a city or borough school district is the equivalent of a 2.65 mill tax levy on the full and true value of the taxable real and personal property in the district. ...").

. Alaska Const. art. IX, § 7.

%. - Alaska Const, art. IX, § 13,

. - Alaska Const. art. II, § 15.

. Six amici also filed briefs. The Fairbanks North Star Borough filed in support of the Borough. Five amici filed:in support of the State: the Citizens for the Educational Advancement of Alaska's Children and the NEA-Alaska each filed a brief; and the Association of Alaska School Boards, the Alaska Council of School Administrators, and the Alaska Superintendents Association filed a joint brief, The Association of Alaska School Boards is "the organization and representative agency of the members of the school boards of the state." The Alaska Council of School Administrators describes itself as an umbrella organization for "four of Alaska's premier educational leadership organizations," including the Alaska Superintendents Association, The Citizens for the Educational Advancement. of Alaska's Children describes itself as a coalition of 23 member school districts and educators, founded in 1998 to "address the problem of aged and deteriorated schools in rural Alaska." NBA-Alaska describes itself as a "statewide labor or-ganziation of 13,000 certified educators and education support professionals serving in Alaska's public schools,"

. State v. Schmidt, 323 P.3d 647, 654 (Alaska 2014) (quoting Alaska Civil Liberties Union v. State, 122 P.3d 781, 785 (Alaska 2005)).

. Id. at 655.

, Se. Alaska Conservation Council v. State, 202 P.3d 1162, 1167 (Alaska 2009) (quoting Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins., 171 P.3d 1110, 1115 (Alaska 2007)).

. See State v. Alex, 646 P.2d 203, 208 (Alaska 1982) ("[The sense in which 'tax' is used in article IX, section 7 of the [Alaska] [Clonstitution must be determined from its context, both in the text and according to the discussions at the constitutional convention which adopted the wording."); Hootch v. Alaska State-Operated Sch. Sys., 536 P.2d 793, 800 (Alaska 1975) ("[An historical perspective is essential to an enlightened contemporary interpretation of our constitution."); id. at 804 (explaining that the events preceding rati- - fication supported the court's interpretation of the state constitution).

, See Bradner v. Hammond, 553 P.2d 1, 4 n. 4 (Alaska 1976) ("Contemporaneous interpretation of fundamental law by those participating in its drafting has traditionally been viewed as especially weighty evidence of the framers' intent."); cf. J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 412, 48 S.Ct. 348, 72 L.Ed. 624 (1928) (citing Myers v. United States, 272 U.S. 52, 175, 47 S.Ct. 21, 71 L.Ed. 160 (1926)) ('This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the [U.S.] Constitution when the founders of our government and framers of our Constitution were actively participating in public affairs long acquiesced in fixes the construction to be given « its provisions.").

. Se. Alaska Conservation Council, 202 P.3d at 1167.

. See §§ 37-3-31 to -33, 37-3-41, 37-3-62 Alaska Compiled Laws Annotated (ACLA) (1949). For example, section 37-3-62 of the Compiled Laws of Alaska required the Territory to refund local districts for part of the cost of maintaining local schools.

, See AS 14.17.410; §§ 37-3-31 to -33, 37-3-41, 37-3-62 ACLA.

. Alaska Const. art. IX, § 7.

. See § 37-3-32 ACLA ("'Every city shall constitute a school district and it shall be the duty of the [city] council to provide the [school district] with ... the necessary funds to maintain public schools, ..."). .

. Id.§ 37-3-41,

. Id. §§ 37-3-24 to -26, 37-23-32, 37-3-53; see also id, § 37-3-33. (establishing authorized expenditures by the school board). These boards possessed the same power to tax as the then- « .existing municipal corporations and incorporated cities: Id. § 37-3-25.

. Id. §.37-3-32.

. Id. § 37-3-53.

. Id § 37~3—35 see AS 14.17.990(6) (defmlng "'local contribution").

. §§ 37-3-55, 37-3-63 ACLA.

. Id. §§ 37-3-61 to -62. Alaska Compiled Laws of 1949 section 37-3-61 provided:
Such per centum of the total amount expended for the maintenance of public elementary schools and high schools, within the limits of any incorporated city or incorporated school district... as the Legislature may from time to time direct, shall be refunded to the school fund of said incorporated city or incorporated school district ... .from the moneys of the Territory....
This refund from the Territory reflects the current state-local: cooperative funding program. See AS 14.17.410 (public school funding).

. See §§ 37-3-61 to -64 ACLA. School districts with more students received proportionally less than school districts with fewer students, Id, § 37-3-62. Refunds were not available for certain expenses, including the cost of levying and collecting taxes and conducting board elections. Id. § 37-3-64. Im reviewing a district's budget, 'the Territory had the authority to "disapprove or - reduce any items in the budget" in calculating the amount of reimbursement. Id, § 37-3-63.

. See, eg., 4 Proceedings of the Alaska Constitutional Convention (PACC) 2651 (Jan. 19, 1956) (statement of Delegate Londborg) (explaining that state-local cooperative programs would encourage local communities to organize into boroughs, the new form of local governance).

. 1975 Format Or. Art'y Gen. Opinion 9, at 3 (May 2, 1975); 3 Araska Sratencon Comm'n, Constr Turionat pt. IX, at 27-30 (1955); 4 PACC 2414 (Jan. 17, 1956).

. See, eg., 4 PACC 2413-16 (Jan, 17, 1956). The delegates, for example, rejected an amendment to the dedicated funds clause proposed by Delegate Buckalew that would have deleted a sentence in the clause that allowed for existing dedications to continue. Id. at 2416, Delegate Buckalew had expressed concern that "the [only] sensible sound way to run a state is to abolish this practice [of earmarking funds} which leads to evils as far as the fiscal management of the state is concerned." Id. at 2413. Delegate Pera-trovich, who participated in the committee that drafted the clause, responded that the committee sought to strike a compromise:
[¥Jou have to compromise. ... [IJt was dangerous to give free rein to the new state in earmarking funds. However, I realize ... that there was some good being accomplished by those 'earmarked funds that we have on the books today and I feel that I cannot support [Buckalew's amendment] on that condition,
Id. at 2414.

. Formar Or. Art'v Grew, supra note 44, at 3 (quoting the draft) (internal quotation marks omitted).

. Id. at 4 (quoting the draft) (internal quotatlon marks omitted).

. - Id. at 8 ("This provision shall not prohibit the continuance of any allocation existing upon the date of ratification of this Constitution by the people of Alaska." (quoting the draft) (mternal quotation marks omitted)).

. See id. at 5; 3 PACC 2302 (Jan. 16, 1956) (statement of Delegate Nerland).

. Alaska Const, art. IX, § 7 (emphasis added).

. See Pus, Abmin. Serv, Comments rrom Pusuc Service AbministratION on Finance Commitee Propos-au 1 (Jan. 4, 1955); see also Format Op. Att'y Gen., supra note 44, at 7 (quoting Pus. Admin. Serv, supra, at 1).

. | Pup. Admin. Serv, supra note 51, at 1 (emphasis added); see also Format Or: Art'vy Gen. supra note 44, at 7 (quoting Pub. Admin, Serv., supra, at 1).

. 4 PACC 2363 (Jan. 17, 1956) (statement of Delegate White); see also Format Or. Ar'y Gen, supra note 44, at 7 (quoting Pus. Admim. Serv, supra note 52, at 1); Se. Alaska Conservation Council v. State, 202 P.3d 1162, 1169 n. 29 (Alaska 2009) (noting the exceptions). Both the Borough and the State appear to agree that the delegates amended the clause to avoid interfering with programs such as pension contributions and state-local cooperative programs.

, - Format Op. Ar'v Gen, supra note 44, at 12-13.

. 4 PACC 2415 (Jan. 17, 1956) (statement of Delegate Nerland); see also id. at 2369-70 (statement of Delegate Peratrovich).

. See id. at 2363 (statement of Delegate White) (explaining that the seven former exceptions were now implicit in the amended clause); For mal Op. Att'y Gen. supra note 44, at 7 (identifying the seven exceptions to which Delegate White referred). ‘ +

. 4 PACC 2652 (statement of Delegate Lond-borg).

, Id. at 2651 (statemeht of. Delegate Londborg).

. See id.; id. at 2650 (statement of Delegate V. Rivers) (noting the example of existing inducements to organize like refunds of taxes "a percentage, at least, of which reverts back to the organized area").

. - Alaska Const. art. X, § 3.

. See, eg., 4 PACC 2630 (Jan. 19, 1956) (statement of Delegate V. Fischer) ("Once you get started on [granting taxing authority}, each separate function could well justify an independent tax levying authority and then you are right back to the type of government that we are trying to avoid in Alaska, the overlapping of independent taxing jurisdictions."); id. at 2632 (statement of Delegate Doogan) ("The thing that is wrong with that fiscal autonomy [giving local school boards taxing authority] is that ... if they were not careful they could break any mun1c1pa11ty within a school district."). f

. See Alaska Const. art. X, § 2 ('The State may delegate taxing powers to organized boroughs and cities only.").

. See Alaska Const. art. X, § 2; 4 PACC 2632 (Jan. 19, 1956) (statement of Delegate Doogan) ("Consequently, with the [borough] assembly having more than the one function of having schools, having many other functions and so many tax dollars, then would be able to distribute the funds as. equitably as possible.").

. - Alaska Const. art. VII, § 1.

. 4 PACC 2652 (Jan..19, 1956) (statement of Delegate Doogan) ("The borough, of necessity, . to provide for its operation would probably have a certain basic tax to provide schools. ..."); ~ see also id. at 2648 (statement of Delegate Doo-gan) ("The would of necessity provide certain basic functions.... [The [Sitate then could very easily delegate whatever it wanted to do to the borough....'") Matanuska-Susitna * Borough Sch. Dist. v. State, 931 P.2d 391, 399 (Alaska 1997) (highlighting the legislature's authority to delegate such responsibility while still 'retaining control over education}.

. 4 PACC 2650 (Jan. 19, 1956). Victor Rivers explained: As Delegate
We thought that at the state level it would be the policy as it has. been in the past to offer certain inducements to them to organize. Now, at the present time in incorporated cities there are certain refunds of taxes in the nature of license taxes, liquor taxes, and other taxes that are a percentage, at least, of which reverts back to the organized area. In the extent that the benefits the legislature sets up will offset the added cost to the people, ... but it was our thought there would be enough inducement for them to organize and exercise home rule so that as time went on they would gradually all become incorporated boroughs.... - The thought was that inducements to organize would be offered on the basis of the granting of home rule powers plus certain other inducements that would make it advantageous to them to be boroughs, as we now have that same program of inducement to organize communities.
Id. (emphases added)

. Id. at 2647 (statement of Delegate Rosswog) (noting that the delegates sought to develop a "flexible" framework on which the legislature could build and fill in the "exact details ... by law"); see also id. at 2654 (statement of Delegate V. Fischer) ("[Alt the same time we visualize the possibility that as the borough becomes a more definite unit of government over the years" it will assume those functions that it could "best ... carr[y] out.").

. See Alaska Const. art. X, § 3.

. See 4 PACC 2629 (Jan. 19, 1956) (statement of Delegate V. Fischer) (explaining boroughs' responsibility for schools); id. at 2652 {statement of Delegate Doogan) (noting that boroughs likely would have to levy taxes to support schools); see also Bradner v. Hammond, 553 P.2d 1, 4 n. 4 (Alaska 1976) ("Contemporaneous interpretation of fundamental law by those participating in its drafting has traditionally been viewed as especially weighty evidence of the framers' intent.").

. See Alaska Const. art. VIL, § 1.

. Ch. 146, § 3.33(a), SLA 1961.

. Id. § 3.33(b).

. See, eg., former AS 14.15.230-.750 (1962). As the legislative history reveals, many of these laws remained unchanged since 1949. See, eg., former AS 14.15.230 (1962) (originally enacted as § 37-3-31 ACLA (1949)); former AS 14.15.240 (1962) (originally enacted as § 37-3-32 ACLA); former AS 14.15.450 (1962) (originally enacted as § 37-3-54 ACLA).

. Ch, 146, § 3.33, SLA 1961,

. Ch. 110, § 9, SLA 1962.

. See former AS- 14.05.010 (1962) (originally enacted as § 37-1-2 ACLA (1949); AS 14.10.010 (1962) (originally enacted as § 37-2-7 ACLA); AS 14.10.300 (1962) (originally enacted as § 37-2-53 ACLA).

. Former AS 14.05.100 (1962) (originally enacted as § 37-1-12 ACLA).

. Former AS 14.17.010-.040 (1962); see also former AS 14.15.050-.070 (1962). The legislature also recognized that the transition to the borough system would take time. Accordingly, until 1966, the legislature left in place many of the parallel territorial laws that required cities to support local schools. Ch. 98, § 61, SLA 1966 . (repealing AS 14.15).

. See Bradner v. Hammond, 553 P.2d 1, 4 n. 4 (Alaska 1976); Se. Alaska Conservation Council v. State, 202 P.3d 1162, 1172 (Alaska 2009).

, 4 PACC 2648 (Jan. 19, 1956) (statement of Delegate Doogan).

, Id. at 2652 (statement of Delegate Doogan).

, Former AS 14.12.010, .020 (1966) (original version at ch. 98, § 1, SLA 1966). ‘

. Former AS 14.12.020(c) (1966) (original version at ch. 98, § 1, SLA 1966). The amount of the state contribution depended on factors like the number of schools in the district, the district's need for special education services, and the specific characteristics of the district, AS 14,17.050-.070 (1966).

, Ch 95 § 1, SLA 1969 ("The amount of state aid is the basxc need.").

. Ch,. 95,§ 11, SLA 1969,

. Compare AS O7 15.330(a) (1970) (“[T]he first and second class borough shall establish, maintain, and operate a system of public schools on an areawide basis."), with ch. 146, § 3.33(a), SLA 1961 ("The first and second class borough shall establish, maintain, and operate a system of public schools. ..."). -

. AS 14.17.021(c)(5) (1970), as amended by ch. 238, § 4, SLA 1970 ("[State aid as computed under this section shall constitute at least 90 per . cent of the basic need as defined by the department of each school district."). A district would only receive state aid if it satisfied its required local funding obligation, - AS 14.17.071(a) (1970), as amended by ch. 238, § 4, SLA 1970 ("Payment of state aid to a local school district ,_ under this chapter is contingent upon matching by the district in the amount of the required local 'effort for that district in the ratio of required local effort. ..."). |

. AS 14.17.021(c)(3) (1970), as amended by ch. 238, § 4, SLA 1970 (defining state aid with respect to the "full and true value of taxable real and personal property within the district divided by the average daily membership of the district").

. Compare AS 14.17.021(c)(3) (1970), as amended by ch. 238, § 4, SLA 1970 (defining state aid with respect to the "full and true value of taxable real and personal property within the district divided by average daily membership of the district"), with AS14.17.030(b) (1963) (defining the required local effort in terms of "the full and true value of taxable real and personal property within the district" but not referring to the number of students in the district), The legislature repealed AS 14.17.030 in 1969. Ch. 95, § 11, SLA 1969, ~ The legislature had last amended the statute in 1963. « See former AS 14.17,030 (1966) (identifying the most recent amendment as session laws of 1963, chapter 70, section 1).

. Compare ch. 26, § 4, SLA 1980 (reframing AS 14.17.021(a) as "[the amount of basic state aid for which each district is eligible" and omitting references to "basi¢ need"), with ch. 90, §§ 2-3, SLA 1977 (separately defining "state aid" and "'basic need").

, Compare ch. 26, § 4, SLA 1980 (noting only that the state aid could be reduced in light of federal contributions), with ch. 90, § 3, SLA 1977 (mandating that state aid constitute "at least 97 per cent of the basic need" of each school district).

. AS 14.17,220 (1982) ("This chapter shall not be interpreted as preventing a public school district from providing educational services and facilities beyond those assured by the foundation program."). As the annotated statutes reveal, in 1982 this section had not been revised since 1962 when the legislature enacted the provision. Id,. (noting only the 1962 enactment under session laws chapter 164, section 1.01).

, AS 29,33.050 (1984) (identifying the most recent amendment as session laws of 1975, chapter 13, section 6, and chapter 124, section 34). In 1972, the legislature repealed former titles 7 (boroughs) and 29 (municipal corporations) and reenacted the provisions under title 29, including those related to borough duties. Ch. 118, SLA 1972. i ,

. Ch. 75, §§ 2-3, SLA 1986.

, See ch. 75, §§ 2, 5, SLA 1986. Section 2 defined state aid for a district in light of its "instructional unit allotment," and § 5 defined "instructional units" to include some of the above factors. Id. The next year, the legislature refined this longstanding cooperative framework, creating new sections for some of the 1986 mandates and combining other mandates with existing sections. See, eg., ch. 91, §§ 3-4, SLA 1987 (recalibrating the formula for state aid and local contributions); id. § 25 (repealing the former provisions).

. § 37-3-32 ACLA (1949).

. AS 14.12.020(c) ("The borough assembly for a borough school district ... shall provide the money that must be raised from local sources to maintain and operate the district.") AS 14.17.410(b) ("'Public school funding consists of state aid, a required local contribution, and eligi-bie federal impact aid. ..."), The legislature has *98 left the AS 14,12.020 mandate untouched since 1975. See AS 14.12.020.

, 4 PACC2629 (Jan. 19, 1956) (statement of Delegate V. Fischer). Compare AS 14.12.020 (2015), with id. (1975), id. (1966), former AS 07.15.330 (1966), and ch. 146, § 3.33, SLA 1961.

. 646 P.2d 203 (Alaska 1982).

. - Id. at 204-05 (Alaska 1982).

. Id. at 208.

, Id. at 209-10.

. Id. at 210.

. Id. at 1158.

. Alaska Const, art, XI.

. Alaska Const, art. IX.

. 836 P.2d 936, 937, 940 (Alaska 1992).

. Id. at 937-38.

. Id. at 938-39 (stating that the act is based on the principle that “the administrators of the Alaska Marine Highway System and the legislature will treat the fund as if the Marine Highway System had a right to its proceeds_' ’).

. Id. at 938.

. Id. at 940.

. Id.

. Id. ("As the debates make clear, all departments were to be ‘in the same position’ as competitors for funds with the need to ‘sell their viewpoint along with everyone else.’ " (quoting 4 PACC 2364-67 (Jan. 17, 1956))).

. 68 P.3d 386, 387-88 (Alaska 2003).

. Id. at 388.

. Id.

. Ch. 190, § 1, SLA 1976; ch. 154, §§ 14-16, SLA 1977.

. Ch. 161, § 2, SLA 1976.

. City of Fairbanks v. Fairbanks Convention & Visitors Bureau, 818 P.2d 1153, 1153-54 (Alaska 1991).

. Alaska Const. art. XI, § 7 ("The initiative shall not be used to dedicate revenues, make or repeal appropriations...."}.

. City of Fairbanks, 818 P.2d at 1155.

. Id. at 1158-59.

. 1d.

. Id.

. Id. at 390-91.

. Id. at 392.

. Id. at 389;

. 202 P.3d 1162, 1165-66, 1177 (Alaska 2009).

. Id. at 1169.

. Id. (quoting State v. Alex, 646 P.2d 203, 210 (Alaska 1982)).

. Id. at 1170; see Myers, 68 P.3d at 392.

. Se, Alaska Conservation Council, 202 P.3d at 1170-71; see Alaska Const. art. VII, § 2 ("[The University of Alaska] shall have title to all real and personal property now or hereafter set aside or conveyed to it. Its property shall be administered and disposed of according to law.").

. Se. Alaska Conservation Council, 202 P.3d at 1171.

. Id. at 1172.

. Alaska Const. art. IX, § 13..

. Alaska Const. art. II, § 15.

. Simpson v. Murkowski, 129 P.3d 435, 447 (Alaska 2006) (quoting the trial court decision}.

. West v. State, Bd. of Game, 248 P.3d 689, 694 (Alaska 2010) (quoting Native Vill. of Elim v. State, 990 P.2d 1, 5 (Alaska 1999)),

. See Alaska Const. art. II, § 15; Alaska Const. art. IX, § 13.

. State v. Alex, 646 P.2d 203, 209 (Alaska 1982) (citing ALASKA STATEHOOD COMM'N, supra note 44, at 29-30).

. Id.; see also Formar Or. Att'y Gen, supra note 44, at 3.

. See Alaska Const. art. II, § 15; Alaska Const. art. IX, § 13.